# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 6, 2009

## STATE OF TENNESSEE v. FRANK DEANGELO TAYLOR

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-05703     Chris Craft, Judge**

---

**No. W2008-01863-CCA-R3-CD  - Filed August 23, 2010**

---

The Defendant-Appellant, Frank Deangelo Taylor, was convicted by a Shelby County jury of first degree felony murder and criminal attempt to commit especially aggravated robbery. He received a life sentence for the first degree felony murder and a concurrent term of eight years imprisonment for the attempted especially aggravated robbery.  On appeal, Taylor claims: (1) the trial court erred in denying his motion to suppress, and (2) the insufficiency of the evidence.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Robert W. Jones, District Public Defender; Phyllis Aluko (on appeal), Tim Albers and Michelle Lynn (at trial), Assistant Public Defenders, Memphis, Tennessee, for the Defendant-Appellant, Frank Deangelo Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; William L. Gibbons, District Attorney General; David Pritchard and Dean Decandia, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

On January 17, 2005, three male juveniles, Clarence Anthony Abernathy ("Abernathy"), Markese Alexander Brooks ("Brooks"), and Frank DeAngelo Taylor (Defendant-Appellant "Taylor"), entered the Little Star Grocery located in Memphis, Tennessee.  One of the three juveniles approached the clerk and said "This is a stick up[.]" During the robbery, Albert Covington, the victim in this case, struggled with one of the juvenile perpetrators and was fatally shot.  Law enforcement personnel later made contact

with Brooks, who was recovering from a gunshot wound at the hospital, and developed Taylor as a suspect. Two days later, on January 19, 2005, law enforcement interviewed Taylor, who provided a statement admitting to his involvement in the murder. Taylor and the other two juveniles were subsequently charged with first degree felony murder and criminal attempt to commit especially aggravated robbery.

**Suppression Hearing**. Taylor filed a motion to suppress the statement that he provided to law enforcement. The motion alleged that the statement "was not knowingly and voluntarily given" because Taylor was a "juvenile" and "a person of limited education." It further alleged that Taylor was coerced into giving the statement because he was not given bathroom breaks, food, or water during the interview. Finally, the motion alleged the statement was "invalid" because Taylor was sleep deprived and under the influence of alcohol and drugs at the time of the interview. The following testimony was offered at the suppression hearing:

Sergeant Thomas Helldorfer of the Memphis Police Department testified that he investigated the murder of the victim. Sergeant Helldorfer first interviewed Taylor's co-defendant, Brooks. Brooks admitted that he was involved in the murder, and he inculpated "Frank" and "Woo." Sergeant Helldorfer was informed by another source that "Frank" was the Defendant-Appellant, Frank Taylor. Sergeant Helldorfer also learned that "Woo" was Abernathy.

Sergeant Helldorfer testified that Taylor was arrested at his school at around 1:30 p.m. He was brought to the homicide office at 2:00 p.m. Sergeant Helldorfer described Taylor as "very quiet." Taylor did not appear to be under the influence of any intoxicants, and he did not complain of sleep deprivation. Taylor was placed in an interview room where he was observed by Brooks through a two-way mirror. Brooks then identified Taylor to the police as one of the individuals involved in the murder.

Sergeant Helldorfer said Taylor was moved to the robbery office where he was placed in another interview room. Because Taylor was a juvenile, they attempted to contact his parent or guardian by phone. At around 4:00 p.m., the police contacted Taylor's mother, and she arrived at the homicide bureau at roughly 4:30 p.m. Sergeant Helldorfer testified that between 2:00 and 4:30, Taylor was offered food, drink, and the opportunity to use the bathroom.

At 4:35 p.m., Sergeant Helldorfer said he and Sergeant Mark Miller interviewed Taylor . Taylor's mother was present during the interview. Sergeant Helldorfer said Taylor was advised of his Miranda rights. Additionally, Taylor and his mother signed an advice of rights form that listed the Miranda rights. Sergeant Helldorfer said he reviewed the form

with them beforehand. Sergeant Helldorfer also had a preliminary discussion with Taylor from which Sergeant Helldorfer could determine that Taylor, in fact, understood the questions being asked. Sergeant Helldorfer learned that Taylor had a ninth-grade education and could read and write. Taylor appeared to understand the questions that were asked, and he provided coherent responses. Taylor was able to read the advice of rights form back to the sergeants. Sergeant Helldorfer testified that during the interview, Taylor did not seem to be under the influence of intoxicants and he did not fall asleep. Sergeant Helldorfer stated, "He appeared, fine." Sergeant Helldorfer described Taylor's mother as "pretty quiet" during the interview.

Sergeant Helldorfer testified that Taylor freely and voluntarily waived his <u>Miranda</u> rights. Taylor initially denied any knowledge of the homicide; however, Sergeant Helldorfer stated:

> [W]e pointed out that there were some things from Markese Brooks['] information that was [sic] not consistent with his information and then he started coming around giving us bits and pieces of information and if he had no knowledge of it he wouldn't have been able to give any information. And after a few little versions that he came out with and his mother just told him to stop lying and tell the truth.

Sergeant Helldorfer said Taylor proceeded to explain his involvement in the murder. At around 5:20 p.m., Taylor gave a formal statement that was recorded by a typist. The typed statement was in question and answer format, admitted as an exhibit to the hearing, and provided in pertinent part the following:

> [QUESTION]: Do you know who is responsible for shooting Albert Covington?
>
> [ANSWER]: Myself and Markese
>
> . . . .
>
> [QUESTION]: In your own words explain what happened before, during, and after the shooting occurred?
>
> [ANSWER]: Elton, Markese, Woo, and myself were on the court playing basketball. I saw Woo clicking the gun. Then I asked him was it loaded. He said, "No[.]" Then he said, "I am just playing it is loaded[.]" So, I stuck it in my pocket and went to the store trying to get

-3-

a drink before we had to go in the house. So, I grabbed my drink trying to pay for it then my phone rang. I turned around to answer it and find it. Then I heard the store clerk say don't shoot. So, I turned around and I saw Markese with the gun on the store clerk. That is when he elbowed Markese in the face and struggled with Markese. Then when he got hold to the gun it went off and I shot. Then I ran out the store and heard three more gun shots [sic]. I saw Markese run out the store and drop a long silver handgun and said, "I'm hit[.]" I asked him what did he just do and he said, "Fool I'm hit[.]" Then I went back to Elton's house and we told Elton's mother. Ten minutes after that Markese came up to our house and his jacket was open. You could see he was shot. So, from my phone I dialed 911. Then they took so long he walked his self down the fire station. Then the next day I saw Woo and he said, "Keep that to yourself[.]"

Taylor continued to explain that Brooks and Abernathy had previously discussed robbing the store. Taylor said that he tried to discourage the others by stating, "Yall can't rob that store. That man has been robbed already [.]" Nevertheless, Taylor admitting firing six shots in the direction of the store clerk during the robbery. He did not receive any money from the robbery. Taylor signed and dated each of the three pages of the statement. His mother also signed the statement. Taylor also identified and signed his name under the photographs of Brooks and Abernathy as the other two individuals involved in the offense.

Sergeant Helldorfer stated that Taylor was advised of his Miranda rights before he gave the statement. Taylor and his mother were given an opportunity to review the statement for accuracy and make corrections. Sergeant Helldorfer testified that Taylor did not invoke his right to an attorney or complain of being mistreated. The statement was completed at 6:00 p.m. and Taylor was then taken to the juvenile court.

On cross-examination, Sergeant Helldorfer said he did not go to the juvenile court to obtain a warrant for Taylor's arrest. He also did not get permission from the juvenile court to hold Taylor during the interview process. Sergeant Helldorfer said Taylor was handcuffed while in the interview room and he was left alone until his mother was contacted. Sergeant Helldorfer was told that Taylor's mother was disabled; however, he did not inquire about the nature of her disability. Sergeant Helldorfer did not believe that Taylor was given the opportunity to speak with his mother in private before the interview began. He said no tests were performed to determine if Taylor was under the influence of intoxicants. Sergeant Helldorfer could not say for certain what happened to Taylor during the two hours that he waited in the interview room. Sergeant Helldorfer said no attempts were made to question Taylor at the juvenile court.

-4-

Taylor testified that he was at school when the police arrested him. At the time, he was seventeen years old and in the ninth grade. Taylor said that he was twice held back in school. Prior to his arrest, Taylor had gone outside with two other students during the lunch period. Over a thirty-minute period, they split half a pint of vodka and smoked three "blunts." Taylor testified that he had done the "same thing" the night before until about 2:00 a.m.

Taylor testified that he was handcuffed in the classroom. He claimed the police did not tell him the basis for his arrest. Taylor was taken to the police station and placed in an interview room. The police did not speak to him while in the patrol car. Taylor testified that he was in the interview room for "a long time" before someone came into the room and spoke to him. He "dozed off" in the interview room and someone had to wake him up. He recalled being asked the name of his mother and said that he was not given permission to use the phone.

Taylor testified that his mother and the detectives came into the interview room at the same time. He was not given the opportunity to speak to her in private. Taylor said his mother was disabled and received social security checks. She suffered from depression and had once attempted suicide. Taylor testified that she cried during the interview process. Taylor said he did not read over his statement before giving it to the police. He stated, "They just told me to sign it." Taylor said he was not informed of his rights before the detective entered the interview room. Taylor asserted that he had never been in trouble with the law before the current proceeding. Taylor was taken to the juvenile court after the interview was completed.

Following the testimony at the suppression hearing, the trial court denied Taylor's motion to suppress. The trial court made the following oral findings:

> Looking at the factors in the Callahan case, that's State versus Callahan, 979 SW2d at page 583, there are six factors that have to be considered.
>
> The first one being, the circumstances surrounding the interrogation, including the juvenile's age, experience, education and intelligence.
>
> We've got a seventeen year old young man. We have someone who is not experienced with the Criminal Justice System, although he has been to Juvenile Court two or three times. . . .

His education. And according to the school records they interviewed, here in this exhibit, is that he repeated kindergarten and he repeated third grade. It doesn't say anywhere that he repeated ninth grade. And so he is a ninth grader, because he repeated kindergarten and third grade.

His intelligence in doing an IQ test in his exhibit here, exhibit "C", he has an IQ of 86, which I find is functional. It's low, but it's a functional IQ. He can read and write, he can talk intelligently.

The second item that I have to consider is the juvenile statute that he understands the <u>Miranda</u> warnings and the consequences of the waiver. In reading the statement, itself, that he gave and the fact that he read the warnings to the detective, I find that he understood the warnings. He understood the consequences of talking to the police.

Number three, the juvenile's familiarity with Miranda warnings, or the ability to read and write in a language used to give the warnings. I feel the same way about that. That although he has an 86 IQ that he understood what was going on.

Number four, is any intoxication. I find Officer Helldorfer to be extremely credible. He remembered things that he remembered and [things] that he was not sure about, he says he couldn't remember. And I find that if this young man had been so drunk at noon that he would have been intoxicated that night, that somebody would have noticed something when he was in class. It just doesn't make any sense.

Now granted, he did make statements and there is an indication in his psychological report that he drinks and smoke marijuana, daily. According to exhibit "C" and the psychological report.

But, I don't find that when this statement was given, Mr. Taylor was intoxicated or under the influence of drugs to where he didn't understand what was going on. The statement itself, he gives a detailed narrative. Says some things that are fairly complex.

. . . .

-6-

And he goes on, in detail, quoting Markese Brooks, whether or not his jacket was opened, or closed.  Whether or not you could see who was shot.  That he dialed 9-1-1.  A fairly detailed statement.

So I find that he was not intoxicated at the time he waived his rights and gave a statement.

Not only because of the credibility of Officer Helldorfer, but also because of the delay and the long time he was there while they talked to Markese Brooks and other persons.

Then the next factor I have to consider is any mental disease, disorder, or retardation.  There is no indication in the psychological report that he was in any way retarded.  They said–I'm quoting from the exhibit "C", the second page of the psychological report by Dr. Joleen Bailey, PhD, licensed Psychologist and certified forensic evaluator:

"Results of the tests revealed an estimated IQ of 86, which is in the low average range of cognitive functioning.  The personality assessment did not reveal any significant psycho pathology."

He was also not emotionally disturbed.   Therefore, he is not committable to an institution for the emotionally disturbed.  Recommendations: Placement with a secure and highly structured correctional facility.

"This young man did not appear to be even mildly remorseful.  Rather he denies the cause and [effect] relationship between his actions and the consequences."

Doesn't give any indication that he could not understand, or was functioning to where he was having any psychological problems, whatsoever.

And six, the presence of a parent, guardian, or interested adult.  The Court's require, if possible, to have a parent there.  Now, whether or not his mother and her actions caused him to give a statement, I don't find that she was the cause of the statement.  However, even if she nudged him a little and he was hesitating about giving a statement, but because she told him to stop lying and tell the truth, he gave the statement.  I don't find that was a state

agency, or action and I don't think that that would change my mind about the fact that the statement was freely and voluntarily given.

Also the Callahan case goes on to say–and also cited in Carroll, that no single factor–it says;

"All Courts should exercise special care in scrutinizing purported waivers by juvenile suspects. But, no single factor should, by itself, render a confession unconstitutional, absent coercive police activity."

I don't see any course [sic] of police activity, at all, in this situation. I don't see that the arrest was wrongful. I think they had probable cause to pick up this young man.

And in the Callahan case and in Carroll to a certain extent, the problem there was that the police did not have the parents there. So the fact that they made sure before they talked to him that his mother was there, I don't think is something that would make this statement less than freely and voluntarily entered.

**Trial.** The following testimony was adduced at trial. Ella Neal, the victim's half-sister, was working at the same store on the night of the murder. She testified that around 7:00 p.m., three young men walked into the store. They entered and exited the store twice without purchasing anything. The three young men entered the store for a third time. The only people in the store were the three young men, the victim, and Neal. She said the victim always kept a gun in his back pocket while in the store. Neal testified that one of the young men approached the victim, who was standing in front of the counter, and said, "[I]t's a stick up." The young man had "something in his hand," which Neal believed to be a gun. Neal described the object as round, skinny, and roughly eighteen-inches long. The victim grabbed the object from the young man, and a struggle ensued. Neal said one of the other young men also appeared to possess a gun. Neal dialed 9-1-1 before taking cover. She heard nine or ten gunshots. Neal said the first shot sounded different from the others. She described the first shot as a "loud blast." Neal could not see what occurred after she took cover. The three young men left the store after the shots were fired. Neal testified that the store's register was jammed, and it could not be opened. Neal said it was functioning properly before the attempted robbery.

On cross-examination, Neal testified that she did not see any of the perpetrators try to open the register. She did not know how it became jammed. After the shooting, Neal went to the homicide office. She was shown photographs of possible suspects. Neal made

-8-

one identification; however, she did not identify Taylor.  On a later date, Neal was shown another photographic display.  She did not identify anyone on that date.

Officer Nathan Newman of the Memphis Police Department testified that he arrived at the store shortly after the shooting.  He found the victim on the ground "laying on a single barrel shotgun."  Officer Newman discovered one spent casing and one spent shotgun shell.

Officer Randall Fuller of the Memphis Police Department testified that he investigated the murder at the store.  He said a handgun was found outside of the store.  The handgun contained three live rounds and three spent rounds.  Officer Fuller said a bullet fragment was found in the victim's body.  Within the store, there was evidence of a shotgun blast, as well as another gunshot.

Sergeant Helldorfer testified that he investigated the murder as part of the homicide bureau. In large part, Sergeant Helldorfer repeated his previous testimony from the motion to suppress hearing.  He added that Taylor initially denied any involvement with the murder or the attempted robbery.  Taylor first denied that he was at the store when the offenses occurred.  Later, he acknowledged that he was at the store, but denied any involvement with the crimes.  Sergeant Helldorfer said Taylor's mother then "told him to tell the truth"and Taylor proceeded to describe his participation in the shooting.  Sergeant Helldorfer testified that Taylor said he had a twenty-two caliber revolver that he fired six times.

On cross-examination, Sergeant Helldorfer acknowledged that it was Sergeant Miller who reviewed the advice of rights form with Taylor.  Sergeant Helldorfer stated that Taylor's statement was not read out loud to him after it was completed.

Dr. Miquel Laboy testified as an expert in the field of forensic pathology. He said his office performed the victim's autopsy.  Dr. Laboy testified that the victim had three gunshot wounds from both high and low velocity firearms.  Dr. Laboy explained that the small caliber bullet that was recovered from the victim's body was consistent with a .22 caliber handgun.  He concluded that the cause of death was the gunshot wound to the victim's chest which was consistent with a high velocity firearm.

Following the proof at trial, the jury found Taylor guilty as charged.  The trial court sentenced Taylor to life imprisonment following the verdict.  At a later date and pursuant to agreement, Taylor received an eight year concurrent term of imprisonment for the criminal attempt especially aggravated robbery.  Taylor filed a motion for new trial that was denied.  He filed a timely notice of appeal.

## ANALYSIS

**I. Motion to Suppress**. Taylor claims the trial court erred in denying his motion to suppress the inculpatory statement he gave to the police. He argues that under the totality of the circumstances, he did not knowingly and voluntarily waive his Miranda rights before giving the statement. Taylor also asserts that the statement was compromised by the police's failure to comply with Tennessee Code Annotated sections 37-1-114 and -115. In response, the State argues that the trial court properly found that Taylor waived his Miranda rights under the factors set forth in State v. Callahan, 979 S.W.2d 577, 583 (Tenn. 1998). The State also contends the police adhered to the requirements of sections 37-1-114 and -115.

The courts of this state have concluded that "a trial court's determination at a suppression hearing is presumptively correct on appeal." State v. Saylor, 117 S.W.3d 239, 244 (Tenn. 2003) (citing State v. Harbison, 704 S.W.2d 314, 318 (Tenn. 1986)). However, if the record on appeal preponderates against the trial court's determination, then the presumption of correctness may be overcome. Harbison, 704 S.W.2d at 318 (citing Mitchell v. State, 458 S.W.2d 630, 632 (Tenn. Crim. App. 1970)). The Tennessee Supreme Court explained this standard in State v. Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

In Callahan, the Tennessee Supreme Court stated that juvenile waivers of Miranda rights should be analyzed under a totality of the circumstances test. 979 S.W.2d at 583. The court held that the following factors should be considered:

> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
>
> (2) the juvenile's capacity to understand the Miranda warnings and the consequences of the waiver;
>
> (3) the juvenile's familiarity with Miranda warnings or the ability to read and write in the language used to give the warnings;

(4) any intoxication;

(5) any mental disease, disorder, or retardation; and

(6) the presence of a parent, guardian, or interested adult.

Id. Additionally, the court stated:

> While courts shall exercise special care in scrutinizing purported waivers by juvenile suspects, no single factor such as mental condition or education should by itself render a confession unconstitutional absent coercive police activity. Colorado v. Connelly, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed.2d 473 (1986).

Id.

Here, the trial court addressed each of the factors discussed in Callahan. First, it considered Taylor's age, experience, education, and intelligence. The court recognized Taylor's limited experience with the criminal justice system, his age of seventeen, and the fact that Taylor was twice held back in school. The court also acknowledged that Taylor had a low, albeit functional, intelligence quotient ("IQ") level. The court addressed Taylor's ability to understand the Miranda warnings and the consequences of his waiver. It found that, based upon the statement itself and the fact that Taylor was able to read the warnings to the police, Taylor understood the warnings and the consequences of his waiver. In regard to factor (3), the court found that despite his low IQ level, Taylor understood the consequences of talking with the police. In considering factor (4), the court concluded that Taylor was not intoxicated when he gave the statement. It credited the testimony of Sergeant Helldorfer, and it also considered the delay between when Taylor said he consumed intoxicants and when the statement was given. The court also weighed the statement's "detailed narrative." Next, the court examined whether Taylor suffered from any mental disease, disorder, or retardation. It relied on a psychological report in the record which did not indicate that Taylor suffered from any psychological problems. Lastly, the court addressed the presence of Taylor's mother in the interview room. The court found that she did not impact Taylor's decision to waive his Miranda rights, as she merely instructed him to tell the truth.

Upon our review, the record does not preponderate against the findings of the trial court. We disagree with Taylor's claim that he was too intoxicated or sleep deprived to waive his Miranda rights. Sergeant Helldorfer testified that he spoke with Taylor before he

gave the formal statement. He said Taylor did not appear to be under the influence of intoxicants, and he did not complain of sleep deprivation. The court found Sergeant Helldorfer to be "extremely credible," and we will not override that determination. Additionally, there was almost no testimony regarding Taylor's condition when he actually gave the statement. His testimony was limited to his claim that he "dozed off" while waiting in the interview room. Taylor's claim regarding his physical conduct is further undercut by his ability to recall specific details during his statement.

We are also unpersuaded by Taylor's claim that he could not waive his Miranda rights due to his age and education level. Sergeant Helldorfer testified that he had a preliminary discussion with Taylor before he gave his statement. Taylor appeared to understand the questions that were asked, and he provided coherent responses. Sergeant Helldorfer said Taylor had a ninth-grade education and could read and write. The record includes a transcript of Taylor's statement. It shows that Sergeant Helldorfer informed Taylor of his Miranda rights immediately before he gave the statement. Sergeant Helldorfer asked Taylor if he understood these rights, and Taylor responded that he did. Taylor was also given the opportunity to read the short advice of rights form before he signed it. We recognize that Taylor has a low IQ level; however, we cannot conclude that he lacked the mental faculties to knowingly and voluntarily waive his Miranda rights. This is evident from his statement in which he discusses his actions before, during, and after the murder. Taylor also appeared to understand the gravity of the situation, as he initially denied any involvement with the murder. Sergeant Helldorfer testified that Taylor ultimately admitted his involvement after his mother instructed him to tell the truth. The record simply does not support Taylor's claim that he was coerced by the police into giving the statement.

Taylor's brief also contains two claims regarding his detention as a juvenile, both of which lack supporting argument, authority, or reference to the record. Ordinarily, these omissions would constitute a waiver of these issues. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Nevertheless, we are able to address the issues presented from the transcript of the motion to suppress. First, Taylor apparently argues that the police failed to comply with Tennessee Code Annotated section 37-1-114 because they did not "promptly give him a detention and a subsequent transfer hearing." Taylor also contends that section 37-1-115 was violated because he was not brought to the juvenile court within a reasonable amount of time.

-12-

Violations of Tennessee Code Annotated Sections 37-1-114 or 115[1] can result in the exclusion of an extra-judicial statement under section 37-1-127(c). However, the Tennessee Supreme Court has held that the protections afforded by section 37-1-127(c) are only applicable in juvenile court, and they have no bearing on the use of the statement at trial. State v. Lundy, 808 S.W.2d 444, 446 (Tenn. 1991) (citing Colyer v. State, 577 S.W.2d 460, 462 (Tenn. 1979) and State v. Turnmire, 762 S.W.2d 893, 896 (Tenn. Crim. App. 1988)); see also State v. Antonio M. Byrd, No. 02C01-9508-CR-00232, 1997 WL 1235, at *10 (Tenn. Crim. App., at Jackson, Jan. 2, 1997) ("A violation of Tenn. Code Ann. § 37-1-115 is not a basis for the exclusion of a statement.").

In addition, to the extent that Taylor claims that section 37-1-114(c)(3) was violated because the juvenile court failed to issue a written detention order outlining the basis for detention until two days after Taylor was taken to the juvenile court, we disagree. See T.C.A. § 37-1-114(c)(3) (1997); see also State v. Waldo Wiggins, Jr., No. W2000-02766-CCA-R3-CD, 2001 WL 1690193, at *5 (Tenn. Crim. App., at Jackson, Dec. 14, 2001).

This court previously addressed this identical issue and explained:

---

[1]Tennessee Code Annotated Section 37-1-114(c)(3) provides in pertinent part:

(c) A child shall not be detained in any secure facility or secure portion of any facility unless:

(3) There is probable cause to believe the child has committed a delinquent offense, and special circumstances in accordance with the provisions of subsection (a) indicate the child should be detained; however, in any such case, the judge shall, within twenty-four (24) hours of the actual detention, excluding nonjudicial days, issue a written order on a form prescribed by the Tennessee council of juvenile and family court judges setting forth the specific reasons necessitating such detention. Nothing in this subdivision (c)(3) shall be construed as requiring a hearing or formal finding of fact, except as otherwise required by § 37-1-117;

Tennessee Code Annotated Section 37-1-115 provides in pertinent part:

(a) A person taking a child into custody shall within a reasonable time:

(2) Bring the child before the court or deliver such child to a detention or shelter care facility designated by the court or to a medical facility if the child is believed to suffer from a serious physical condition or illness that requires prompt treatment. A person taking a child into custody shall give notice thereof, together with a reason for taking the child into custody, to a parent, guardian or other custodian and to the court. . . .

Tennessee Code Annotated section 37-1-114(c)(3), applies in circumstances where the child is alleged to have committed only a "delinquent offense" and where "special circumstances" indicate the child should be detained. Since section 37-1-114(c)(1)(A), quoted <u>supra</u>, is clearly applicable under the circumstances in this case and does not require a written order, we find that the juvenile court did not err in ordering detention or by declining to specify the basis for the detention in writing.

<u>Id.</u> at *5. Accordingly, Taylor is not entitled to relief on this issue.

Taylor also contends that the police did not comply with section 37-1-115 because he was not brought to the juvenile court within a reasonable amount of time. The record shows that Taylor was taken into custody at his school at around 1:30 p.m. He was brought to the homicide bureau where he waited in an interview room for two hours while the police attempted to contact his mother. Sergeant Helldorfer testified that Taylor's mother arrived at the homicide bureau at roughly 4:30 p.m. Sergeant Helldorfer said the interview process began at about 4:35 p.m., and Taylor's statement was taken at 5:20 p.m. The statement shows that Taylor signed and dated it at 6:03 p.m. Taylor was then taken to the juvenile court. The trial court determined that Taylor was taken to juvenile court within a reasonable time, and we agree. Taylor has not shown that the period of time between when he was taken into custody and his delivery to the juvenile center was unreasonable. Consequently, Taylor is not entitled to relief on this issue.

**II. <u>Sufficiency of the Evidence</u>**. Taylor claims that neither of his convictions were supported by sufficient evidence. He argues that the State failed to prove that he intended to commit robbery or especially aggravated robbery. Taylor also contends that the proof did not show that he caused the victim's death. In response, the State argues that a rational jury could have found Taylor guilty of both offenses.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." The requirement that guilt be found beyond a reasonable doubt is applicable in a case where there is direct evidence, circumstantial evidence, or a combination

-14-

of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977) and Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. Odom, 928 S.W.2d at 23.

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn.1993)). This court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

Taylor was convicted of first degree felony murder under Tennessee Code Annotated section 39-13-202(a)(2). This section states in relevant part:

(a) First degree murder is:

(2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy[.]

A conviction for felony murder requires proof that the defendant intended to commit the underlying felony. Id. § 39-13-202(b). Here, Taylor was charged with the underlying felony of attempted robbery. Robbery is defined under section 39-13-401(a) as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Section 39-12-101 sets forth the requirements for attempt offenses:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

-15-

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

In viewing the testimony at trial, sufficient evidence was presented that Taylor attempted to perpetrate a robbery which resulted in the victim's death. Taylor admitted in his statement that before the shooting, Brooks and Abernathy discussed robbing the store. Taylor claimed he was against the robbery; however, he admitted that he entered the store with a loaded gun. An employee at the store testified that prior to the shooting, three young men entered and exited the store twice in a short period of time. She said they walked around the store, but did not purchase anything. The employee stated that when the young men entered the store for a third time, one of the young men approached the victim and said, "[I]t's a stick up." The employee testified that this young man appeared to possess a gun and the victim fought to gain possession of it. The employee stated that one of the other young men also appeared to possess a gun. After the employee took cover, she heard nine or ten gunshots. Taylor admitted in his statement that he fired six gunshots at the victim after he saw Brooks and the victim become embroiled in a struggle. The employee testified that she did not see any of the perpetrators try to open the register; however, it was jammed when she examined it after the shooting. The employee said the register functioned properly before the shooting. In considering the foregoing evidence in the light most favorable to the State, a rational jury could have found that Taylor attempted to perpetrate a robbery which resulted in the victim's death.

We disagree with Taylor's claim that there was insufficient proof that he "attempted to take anything from the victim." Through the guilty verdict, the jury clearly discredited Taylor's statement that he was inadvertently caught up in the robbery while trying to purchase a beverage. Based on the evidence discussed above, it is reasonable to infer that Taylor intended to rob the store with Brooks and Abernathy. We are also unpersuaded by Taylor's claim that the State had to prove Taylor caused the victim's death. Presumably, he is arguing that it was necessary to show that Taylor killed the victim. This argument misstates the law, as this court has stated, "When one enters into a scheme with another to commit one of the felonies enumerated in T.C.A. § 39-2-202 and death ensues, both defendants are responsible for the death, regardless of who actually committed the murder and whether the killing was specifically contemplated by the other." State v. Brown, 756

S.W.2d 700, 704 (Tenn. Crim. App. 1988) (citing Dupes v. State, 354 S.W.2d 453, 456 (Tenn. 1962)).

Taylor was also convicted of criminal attempt to commit especially aggravated robbery. This offense, which is codified under section 39-13-403, states:

(a) Especially aggravated robbery is robbery as defined in § 39-13-401:

(1) Accomplished with a deadly weapon; and

(2) Where the victim suffers serious bodily injury.

As discussed above, there was adequate proof that Taylor attempted to perpetrate a robbery. The other two requirements of section 39-13-403 were also met. The proof showed that Taylor attempted to commit the robbery by using a deadly weapon. Taylor admitted that he brought a concealed weapon into the store. Additionally, Taylor said he shot the victim after he tried to take to possession of Brooks's gun. There was also proof that the victim suffered serious bodily injury, as a forensic pathologist testified that the victim suffered three gunshot wounds. Therefore, we conclude that a rational jury could have found Taylor guilty of criminal attempt to commit especially aggravated robbery. He is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE