STATE of Tennessee, Appellee,

v.

Ginger TURNMIRE, Appellant.

Court of Criminal Appeals of Tennessee, at Knoxville.

July 26, 1988.

Permission to Appeal Denied by Supreme Court Nov. 7, 1988.

K. Kidwell King, Jr., King & King, Greeneville, for appellant.

W.J. Michael Cody, Atty. Gen., Bettye Springfield–Carter, Asst. Atty. Gen., Nashville, C. Berkeley Bell, Dist. Atty. Gen., James E. Pryor, Asst. Dist. Atty. Gen., Greeneville, for appellee.

## OPINION

SCOTT, Judge.

The appellant was convicted of two counts of murder in the first degree and received concurrent life sentences in the state penitentiary. On appeal she has presented three issues, none of which challenge the sufficiency of the convicting evidence. However, a brief recitation of the facts will aid in understanding the other issues.

The appellant is the daughter of the victims, James W. and Velma Jean Turnmire. At the time of the offenses she was fifteen years of age. April 27, 1986 was a Sunday. Early that morning the appellant called her friend, Kimberly Jo Showman, and invited her to go to church with her and her parents. She declined the invitation. Later, while the victims were at church, she again called Ms. Showman and they chatted about various matters. She called Ms. Showman again later and they discussed school work. Still later, she called again and informed Ms. Showman that she was going to kill her parents. Ms. Showman expressed her disbelief and they discussed other matters. Later she called Ms. Showman again and restated what she planned to do.

After services that morning the victims stayed late at church because it was Mr. Turnmire's birthday and the congregation had a party for him.

Between 12:00 o'clock noon and 1:00 P.M., Ms. Showman went to the appellant's home, which was a five minute walk from her home. There she found the appellant jittery, shaking and nervous. She made some coffee and fed it to the appellant to calm her down. The appellant then showed her a pistol which was fully loaded, except one bullet had been fired. Ms. Showman then reloaded the gun for her, replacing the spent shell with a live one. After the appellant calmed down, Ms. Showman went home.

The victims left the Limestone Church of Christ at 2:26 P.M. and returned to their home. The appellant's father laid down on the living room couch to nap and her mother went to the bedroom and also laid down to take a nap. The appellant took the pistol, went into the bedroom and shot her mother three times. Hearing the gunshots, her father arose from the couch and started down the hall to the bedroom. The appellant shot him in the face. The bullet entered just to the left of the mid-line of his nose. It destroyed his brain stem and his death was termed by the pathologist as "essentially instantaneous." According to the pathologist her mother lived from two to five minutes from the wounds inflicted upon her. Her lethal wound was a shot to the head in front of the left ear.

The appellant left her home and went to Ms. Showman's. Together they went to Tweed's Amusement where the appellant solicited help from Frederick Hawkins. She offered him $500.00 and 300 Valium pills. He described the appellant as calm. Jamie Lynn Gilbert, who was with Mr. Hawkins, called the sheriff's department and reported the murders. It took him a considerable length of time to convince the dispatcher that he was serious.

Numerous witnesses testified for the state, including many of the young people who were at Tweed's Amusement, and Gail Hammonds who met the appellant in pretrial detention and to whom she confessed killing her parents. In addition, the state introduced her confession.

The motive established for the killing was that there had been considerable difficulty between the appellant and her parents. The difficulty stemmed from her rebellious nature, drug abuse, and promiscuous sexual activities. She had run away in

the past. Her mother had placed her in the Morristown Youth Shelter, but went and got her for a furlough on the Thursday before the murders occurred on Sunday. On the Friday night before the murders, the appellant had been the victim of a gang rape. She did not want to report the rape, but her mother had insisted that she do so.

The appellant testified in her own defense, contending that she did not kill her parents, but that they were killed by the leader of a motorcycle gang known to her only as "Papa Smurf." According to her, she met him at the swimming hole at Horse Creek some period of time before the murders and she never saw him again until that Sunday when he was brought to her house in a truck driven by someone else. According to her, Papa Smurf was looking for Valium. Her parents took a lot of medications and her mother had Valium in the home, but had it hidden from the appellant. Together she and Papa Smurf went through the house finding the Valium. Papa Smurf found the victims' gun and said that he had decided to kill them because they were going to turn him in to the police, even though there was no evidence that her parents had ever met him. He also told her to call one of her friends and tell the friend that she was going to kill her parents. She called Ms. Showman, who came over as she testified. According to her, Papa Smurf was hiding in the closet while Ms. Showman was there and he remained in her bedroom until her parents arrived home from church, at which time he killed them. He threatened to kill her and her sister if she told, and told her that she had to take the blame for the murders. The truck returned and picked up Papa Smurf, and she went to Tweed's Arcade where she reported that she had killed her father and mother.

She also presented proof from a member of the First Judicial District Drug Task Force to establish that there was an individual known as "Papa Smurf." A neighbor testified that she saw a small red truck backing out of the victims' driveway before supper time. She also presented proof from her married sister that she had not heard any threats from the appellant addressed to their parents.[1]

In rebuttal the state presented the testimony of Robert Douglas Slimp, the man who, according to the appellant, carried her to Horse Creek where she met Papa Smurf. According to him, he dated her for three weeks in January 1986, but he did not see her at all during the time that she alleged he carried her to Horse Creek for the encounter with Papa Smurf.

In surrebuttal the appellant again testified, contending that Mr. Slimp lied when he denied taking her to Horse Creek. She contended that he sold drugs and smoked pot with Ms. Showman.

■ Based upon this hotly contested proof, the jury found the appellant guilty of both murders. While there is no challenge to the sufficiency of the evidence, it is clear that there was ample, indeed overwhelming, evidence from which any rational trier of fact would conclude beyond a reasonable doubt that it was the appellant, not Papa Smurf, who killed the victims. Rule 13(e), T.R.A.P., *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 2786–2792, 61 L.Ed.2d 560 (1979).

■ In the first issue the appellant contends that she should not have been transferred from the Juvenile Court to the Criminal Court for trial as an adult. T.C.A. § 37–1–134(a)(1) provides for the transfer of juveniles to the criminal court "to be dealt with as an adult" if, among other things, the child was more than fourteen years of age and was charged with murder. In order for the child to be transferred, the court must find that there are "reasonable grounds to believe" that (1) the child committed the delinquent act as alleged; (2) the child is not committable to an institution for the mentally retarded or mentally ill; and (3) the interest of the community re-

---

**1.** The appellant was only ten years old when her sister left home.

quires that the child be put under legal restraint or discipline. T.C.A. § 37–1–134(a)(4)(A)–(C). The appellant contends that she should not have been transferred from juvenile court because she was committable to an institution for the mentally ill.

At the acceptance hearing Winston Kitchin, M.D., the Medical Director of the Nolachuckey–Holston Mental Health Center, testified for the appellant. According to him, she suffered from four disorders, an adjustment reaction, a conduct disorder, an identity disorder and mixed substance abuse. In his opinion she was committable to an institution for the mentally ill. However, when cross-examined about her confession, which he had not read, he admitted that, if such a document existed and if it would contradict what she told him about having no memory since taking Valium, that it would change his opinion.[2]

Peggy Cantrell, Ph.D., a clinical psychologist and Assistant Professor of Psychology at the Quillen–Dishner College of Medicine, testified for the state. She examined the appellant on four occasions and administered four separate intelligence and personality tests.[3] According to Dr. Cantrell, the appellant suffered no mental illness and is not committable to an institution for

the mentally ill. According to her, the appellant suffers only from a conduct disorder characterized by socialized aggressive behavior.

Based upon the proof from these professionals and the proof from the various other witnesses who testified concerning the circumstances of the killing, it is clear that the appellant was not committable to an institution for the mentally ill, and the criminal court correctly accepted jurisdiction over her. This issue has no merit.

In another issue the appellant contends that the statements taken by police officers violated the provisions of T.C.A. § 37–1–127(b). However, this section of our code deals with the rights of a child at a hearing in the Juvenile Court and does not relate to statements made out-of-court to police officers.

█ The appellant admits that she was advised of her *Miranda* rights, but contends that she did not have the benefit of independent advice from her family or from any source. In *Colyer v. State,* 577 S.W.2d 460, 463 (Tenn.1979), a divided Tennessee Supreme Court held that the rights bestowed upon children charged with a delinquent act do not apply to a child transferred from Juvenile Court for trial as an adult in the criminal court.

---

**2.** The only proof in the transcript as originally filed in this Court regarding the transfer and acceptance hearings was the testimony of Irwin Goldzweig, one of the directors of Cumberland Hall Psychiatric Hospital, and Dr. Kitchins. The record did not contain the findings of fact and conclusions of law of the trial judge. Therefore, this Court, by order filed May 11, 1988, directed the trial judge to file his findings and conclusions. On June 9, 1988, the trial judge complied and also filed a transcript of the balance of the testimony received at the acceptance hearing. Thus, as originally filed, the transcript presented to this Court contained only testimony generally favorable to the appellant's contention that she is committable to an institution for the mentally ill. The supplemental transcript contains the rest of the story.

It is the responsibility of the appellant to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a *fair, accurate and complete* account of what transpired with respect to those issues that are the bases of appeal." Rule 24(b), T.R.A.P. (Emphasis added). Within fifteen days after

service of notice of filing of the transcript the appellee shall file his objections to the transcript as filed. *Id.* Any differences regarding the accuracy of the transcript shall be settled by the trial judge, who can correct or modify the record to conform to the truth. Rule 24(e), T.R.A.P. It is then the responsibility of the trial judge to authenticate the transcript. Rule 24(f), T.R.A.P. Neither the parties nor any court can add to or subtract from the record except to insure that it conveys a fair, accurate and complete account of what transpired in the trial court concerning the appellate issues. Rule 24(g), T.R.A.P.

How this potentially misleading transcript got filed without anyone noticing its shortcomings is not known to this Court. Suffice it to say, such must not happen again, and counsel and the trial courts are usually the only ones in a position to insure that it does not.

**3.** She first examined the appellant five days after the offenses occurred.

The appellant's statements were admitted in criminal court and the provisions of the juvenile code were inapplicable. This issue has no merit.

In the final issue the appellant contends that the trial judge erred by excluding prior self-serving statements she made to her aunt.

■ Wilma Hunt was called as a defense witness. On direct examination, the appellant's counsel asked her to recount the statements the appellant made to her concerning how the murders took place. The state objected and defense counsel contended that it was an admission which fit the admission against interest exception to the hearsay rule. The trial court held that only the opposing party can introduce admissions made by the other party and that her self-serving statements were, therefore, inadmissible.

In *State v. Wiseman*, 643 S.W.2d 354, 366 (Tenn.Crim.App.1982), this Court examined an effort by the appellant to place before the jury a self-serving statement he gave to the Tennessee Bureau of Investigation. This Court held that the exculpatory statement was properly excluded. In so doing, we relied on *Moon v. State*, 146 Tenn. 319, 242 S.W. 39, 54 (1921), *Hall v.*

*State*, 552 S.W.2d 417, 418 (Tenn.Crim.App. 1977), and *Wharton's Criminal Evidence* 13th ed., § 303, where the reason for the rule is explained. The reason self-serving declarations are excluded is that there is nothing to guarantee their testimonial trustworthiness. If such evidence was admissible, the accused could create evidence for himself by making statements in his favor for subsequent use at his trial to show his innocence. The trial judge correctly excluded this evidence, and this issue has no merit.

Finding no merit to any of the issues presented by the appellant, the judgment is affirmed.

BIRCH, J., and JAMES C. BEASLEY, Special Judge, concur.