IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 5, 2016

## JURICO READUS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 06-06183     Carolyn Wade Blackett, Judge**

---

**No. W2015-00338-CCA-R3-PC  -  Filed February 23, 2016**

---

The petitioner, Jurico Readus, appeals the denial of his petition for post-conviction relief, which petition challenged his Shelby County Criminal Court jury convictions of felony murder and attempted especially aggravated robbery.  Discerning no error, we affirm the denial of post-conviction relief.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Rosalind Brown, Memphis, Tennessee, for the appellant, Jurico Readus.

Herbert H. Slatery III, Attorney General and Reporter; Lacy E. Wilber, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Nicole Germain, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

A Shelby County Criminal Court jury convicted the petitioner of the first degree felony murder of Luis Reyes Hernandez and two counts of the attempted especially aggravated robbery of Luis Reyes Hernandez and his nephew, Jary Reyes.  On direct appeal, this court summarized the relevant facts as follows:

> The evidence at trial established that the defendant approached the two victims, pointed a gun at them, demanded the deceased victim's money, and then shot both victims when a struggle ensued after the co-defendant hit the surviving victim.  Although the surviving victim testified that the defendant did not verbally demand his money, he also

> testified that he had a limited understanding of English, that he nevertheless understood from the context that the defendant wanted his money, and that he thought the co-defendant was approaching him in order to take his money.

*State v. Jurico Readus*, No. W2011-01544-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Jackson, Jan. 16, 2013), *perm. app. denied* (Tenn. June 13, 2013). The defendant provided a statement to the police prior to trial acknowledging his involvement in the offenses, explaining

> that he and his cousin saw the victims, and that he "pointed the gun and told them to give me everything out of their pockets." The defendant instructed his cousin to check the victims' pockets, and the surviving victim and co-defendant began "tussling." The surviving victim began to yell and "shots were fired." The defendant stated that he "accidentally" shot the co[-]defendant and shot twice at one victim and three times at the other. He stated that neither he nor the co-defendant took property from the victims. The defendant explained that they had gone to the apartments to "get some money" and further elaborated that he meant "[r]obbing Mexicans, getting some money." The defendant described where he had left the weapon at the co-defendant's house.

*Id.*, slip op. at 5.

On January 28, 2014, the petitioner filed a timely petition for post-conviction relief alleging that he had been denied the effective assistance of trial counsel. Specifically, he claimed that his counsel performed deficiently by failing to ensure suppression of the petitioner's pretrial statement to the police, by failing to develop an alternative theory of defense and to cross-examine a State's witness in a manner that would have supported such a theory, by failing to object to the trial court's refusals to conduct "a proper sentencing hearing" or instruct the jury regarding parole consideration, and by failing to object to the trial court's "sentencing the petitioner to a 51-year sentence with the possibility of parole that is in fact a de facto life sentence without parole." Following the appointment of counsel, the petitioner filed two amended petitions for post-conviction relief, reiterating these same grounds for relief and adding a claim that the mandatory life sentence in this case amounted to cruel and unusual punishment.

-2-

At the November 17, 2014 evidentiary hearing, the petitioner testified that on the day of the offenses, he went to the home of his cousin, Toddreck Watts, for a short time and that the two parted company before Mr. Watts was shot. He said that Mr. Watts's mother picked him up and drove him to the hospital to speak to the police despite that the 16-year-old petitioner's parents were at church. The petitioner testified that at the hospital the police questioned him about the shooting before his parents arrived and that he told them that he and Mr. Watts were walking to Mr. Watts's house when Mr. Watts was struck by a stray bullet. The petitioner testified that although his parents arrived at the hospital, they were not allowed to transport the petitioner to the police station for further questioning. Instead, the petitioner traveled to the police station in the back of an unmarked patrol car accompanied by two police officers. Once at the police station, he said, he was handcuffed and shackled to a chair inside an interview room where he waited several hours without food or water before more officers arrived to interview him. The petitioner said that he initially told his parents the same version of events he provided to the police at the hospital. After his stepfather "told [him] that [he] need[ed] to go ahead and tell the truth," the petitioner provided the statement that was admitted into evidence at trial, which he characterized as "what actually happened." He said that he was not allowed to speak with his mother at any point prior to giving the statement and that his stepfather, who was Mr. Watts's cousin, was interested in finding out the truth about who had shot Mr. Watts.

The petitioner insisted that although he met with his trial counsel prior to trial, the two did not discuss trial strategy. He said that he felt unprepared for his trial. He acknowledged, however, that he discussed with counsel the advantages and disadvantages of testifying at trial and that he made the decision not to testify. The petitioner said that trial counsel did not present any witnesses at trial and that he wanted his mother and stepfather to testify, even though neither was present during the offenses. The petitioner also complained that trial counsel failed to explain to him what was meant by a sentence of life with the possibility of parole. He said that the trial court did not conduct a sentencing hearing prior to imposing the life sentence.

Ann Marie McCallum, the petitioner's mother, testified that on the day of the offenses, she was at church when she received a telephone call from Mr. Watts's mother, who told her to come to the hospital because Mr. Watts had been shot. She said that she did not have an opportunity to speak with the petitioner alone that day. She said that the police told her and her husband, the petitioner's stepfather, to come to the police station where the petitioner was to be questioned. They went to the police station, and, after about an hour, an officer came and asked the petitioner's stepfather to come into the interview room. She said that after the petitioner provided a statement, the officer gave her a paper to sign but that she "really didn't know what [she] was signing." She said

that she was not given any opportunity to assess the situation or to seek counsel prior to the petitioner's providing his statement.

Walter Lee Raiborn, Jr., testified that he married the petitioner's mother when the petitioner was five years old. He explained that Mr. Watts's "great grandmother was married to [his] second cousin," so the two men considered themselves cousins. Mr. Raiborn relayed a series of events for the day of the offenses that matched that provided by Ms. McCallum. Mr. Raiborn said that when he was allowed to speak with the petitioner, he urged the petitioner to tell the truth. He acknowledged that he did not know that the petitioner had been accused of murdering Mr. Hernandez. He said that he did not consider suggesting that the petitioner ask for an attorney. Mr. Raiborn said that he told the petitioner's counsel that Mr. Watts was his cousin.

Trial counsel testified that he filed a motion to suppress the petitioner's incriminating pretrial statement on grounds that the statement was involuntary and that the police lacked probable cause to arrest the defendant. He recalled that in preparing for the hearing on the motion to suppress the petitioner's statement, he spoke with the petitioner, the petitioner's mother, and the petitioner's stepfather to develop a timeline leading up to the petitioner's confession. He said that after discussing that timeline and reviewing the advice of rights and rights waiver forms, "it became obvious that it was going to be a hard time kind of attacking what happened once the parents got involved." He decided that the best strategy was to attack the petitioner's initial interview with the police, which led to the later statement, and that the petitioner "was really the only one who could testify to that." He stated that "for the most part [the petitioner] didn't give any incriminating statements until the Raiborns got involved." He said that he did not call either of the petitioner's parents to testify at the suppression hearing because their testimony would not have supported his strategy. Counsel testified, "As a matter of fact, it would probably hurt us since they had actually both parents had signed the statement and Mr. Raiborn had signed the statement and the Waiver of Rights."

Trial counsel testified that he met with the petitioner 28 times at the jail in addition to the meetings he had with the petitioner and the petitioner's parents during court appearances. He said that he had "in excess of 75 contacts either in the courts or going down to discuss the matter with him in the jail." Counsel recalled that the reason for the large number of visits with the petitioner was to allow him to "cover everything from strategy to range of punishment, to testifying." He added that he also reviewed the discovery materials with the petitioner and that he told the petitioner that the most damning piece of evidence was the petitioner's detailed confession to the crimes. Counsel said that when asked, the petitioner "agreed that what he had told the police was actual accurate rendition of what actually transpired which was consistent" with the statements provided by Mr. Watts and by Mr. Reyes. He testified that the defense

strategy was to emphasize the defendant's youth as a means to undermine the "mountain of proof" of the defendant's guilt.

Trial counsel testified that the State never made any plea offer that included a reduction in the charged offenses or the sentence of life imprisonment despite counsel's attempts to negotiate. Counsel said that as to the convictions of attempted especially aggravated robbery, the trial court did not conduct "a Sentencing Hearing on those per se." He explained that the prosecutor agreed to a sentence of 10 years for each conviction to be served concurrently to one another and concurrently to the life sentence imposed for the murder conviction. Counsel said that the prosecutor's agreement allowed the petitioner to avoid the possibility of consecutive sentencing. He recalled that he discussed the sentence with the petitioner and that the two specifically discussed the specifics of the sentence of life imprisonment. He said that he did not object to the imposition of the life sentence because that was the only sentence available under the law.

During cross-examination, trial counsel reiterated that the primary thrust of his motion to suppress the petitioner's statement was that the statement was not voluntary and that the basis for that claim was the petitioner's youth and the fact that some of the questioning occurred prior to the arrival of the petitioner's parents. Consequently, trial counsel said that he took into consideration the petitioner's age, maturity level, familiarity with the criminal justice system, and his family and social background. He testified that he found the petitioner to be an intelligent young man with a good family background. When asked whether he had moved for the suppression of the petitioner's statement under the terms of Code section 37-1-115, counsel responded that he had not invoked the statute but had argued that the State lacked probable cause to arrest the defendant, one of the exceptions to the application of that statute. He noted that "[a]ll of these issues were addressed and litigated and then ruled upon."

In a written order denying relief, the post-conviction court concluded that the petitioner had failed to establish any of his claims by clear and convincing evidence. The court found that counsel did not perform deficiently by failing to seek suppression of the petitioner's statement under the terms of Tennessee Code Annotated section 37-1-115 because the petitioner's statement was not subject to suppression under the terms of that statute. The court also concluded that the petitioner had failed to establish that counsel performed deficiently by failing to communicate a plea offer from the State because the uncontroverted proof at the evidentiary hearing established that no such offer had been made. The court determined that counsel did not perform deficiently by failing to object to the imposition of the life sentence in this case because that sentence was the only one available under the law. Finally, the court concluded that the petitioner's life sentence did not violate the constitutional prohibition on cruel and unusual punishment.

-5-

In this appeal, the petitioner reiterates his claim of ineffective assistance of counsel, arguing that counsel failed to adequately advocate for suppression of his pretrial statement under the terms of Tennessee Code Annotated sections 37-1-115 and -127.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

A claim of ineffective assistance of counsel, specifically, is a mixed question of law and fact. *See Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015); *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick*, 454 S.W.3d at 458 (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The petitioner argues that his statement was obtained in violation Code section 37-1-115 and thus subject to suppression under Code section 37-1-127 and that trial counsel performed deficiently by failing to make this argument in the trial court. Code section 37-1-115 provides, in pertinent part, as follows:

> (a) A person taking a child into custody shall within a reasonable time:
>
> (1) Release the child to such child's parents, guardian or other custodian upon a promise by such person or persons to bring the child before the court when requested by the court unless such child's detention or shelter care is warranted or required under § 37-1-114; or
>
> (2) Bring the child before the court or deliver such child to a detention or shelter care facility designated by the court or to a medical facility if the child is believed to suffer from a serious physical condition or illness that requires prompt treatment. A person taking a child into custody shall give notice thereof, together with a reason for taking the child into custody, to a parent, guardian or other custodian and to the court. If the child is taken into custody pursuant to the provisions of § 37-1-113(a)(3) prior to the filing of a petition, a petition under § 37-1-120 shall be filed as soon as possible but in no event later than two (2) days after the child is taken into custody excluding Saturdays, Sundays and legal holidays.

T.C.A. § 37-1-115(a). Code section 37-1-127 provides that "[a]n extra-judicial statement, if obtained in the course of violation of this part or that would be constitutionally inadmissible in a criminal proceeding, shall not be used against the child." *Id.* § 37-1-127(c).

We note, initially, that the issue of the voluntariness of the petitioner's statement as well as the probable cause supporting the detention that preceded the statement was thoroughly litigated at trial and on appeal. *See Jurico Readus*, slip op. at 9-12. On direct appeal, this court affirmed the trial court's ruling that, examining the totality of the circumstances, the petitioners's waiver of his rights and his subsequent confession were voluntary. *See id.*, slip op at 12. Any attempt to shoehorn a rehashing of this issue into a claim that counsel performed deficiently by failing to adequately move for suppression of the petitioner's statement is insufficient to overcome the bar of Code section 40-30-106, which provides that "[a] ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing." T.C.A. § 40-30-106(h).

Moreover, the petitioner's claim that his statement should have been suppressed under the terms of Code sections 37-1-115 and -127 lacks merit. Our supreme court has held that Code section 37-1-127(c) "guarantees only that a juvenile's statements taken in violation of T.C.A. § 37-1-115 will not be used against him or her in a proceeding *in juvenile court*." *State v. Lundy*, 808 S.W.2d 444, 446 (Tenn. 1991) (citing *Colyer v. State*, 577 S.W.2d 460, 462 (Tenn. 1979); *State v. Turnmire*, 762 S.W.2d 893, 896 (Tenn. Crim. App. 1988)) (emphasis added); *see also State v. Carroll*, 36 S.W.3d 854, 862 (Tenn. Crim. App. 1999) ("Thus, when police take a child into custody and conduct an interrogation, *the admissibility of any resultant statement in a juvenile court proceeding* will depend both upon satisfaction of the reasonable time requirements of Tenn. Code. Ann. § 37-1-115 and the knowing and voluntary nature of the confession." (emphasis added)).

Finally, the petitioner claims that, had counsel sought suppression of the petitioner's statement pursuant to Code section 37-1-127(c) in the juvenile court, the statement could have been deemed inadmissible at the transfer hearing and that, without the statement, the petitioner would not have been transferred to be tried as an adult. In our view, this claim is too specious to warrant relief under the circumstances in this case. First, it is not clear from the evidence adduced at the suppression hearing, the trial, or the evidentiary hearing that the State failed to comply with the terms of Code section 37-1-115. To be sure, the petitioner was not released to the custody of his parents following his confession, but the petitioner presented no evidence with regard to the time when the petitioner was taken before the juvenile court. Code section 37-1-115 requires "that, within a reasonable time of taking a child into custody, the police must either release the

child to his parents' custody, *bring the child before the court*, or *place the child in an appropriate detention facility for juveniles, thereby triggering procedural protections relating to the detention of juveniles*." *Carroll*, 36 S.W.3d at 863 (first emphasis added). Additionally, Code section 37-1-115 allows for continued detention of a child in the custody of the police when "such child's detention or shelter care is warranted or required under § 37-1-114." T.C.A. § 37-1-115(a)(1). One such exception contained in Code section 37-1-114 exists when "[t]here is probable cause to believe the child has committed a delinquent offense constituting . . . [a] crime against a person resulting in the . . . death of the victim." *Id.* § 37-1-114(a), (c)(1). Both the trial court and this court considered and rejected the petitioner's claim that the police lacked the probable cause to support his custodial interrogation. *See Jurico Readus*, slip op. at 12.

Because the evidence does not preponderate against the post-conviction court's conclusion that the petitioner failed to prove his claim of ineffective assistance of counsel by clear and convincing evidence, we affirm the judgment of that court denying post-conviction relief.

_____
JAMES CURWOOD WITT, JR., JUDGE