IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 4, 2016

**STATE OF TENNESSEE v. DEKARLOS JOHNSON**

**Appeal from the Criminal Court for Shelby County**
**No. 13-06128     Glenn Ivy Wright, Judge**
_____

**No. W2015-02412-CCA-R3-CD  -  Filed January 31, 2017**
_____

A Shelby County Criminal Court jury convicted the Defendant-Appellant, Dekarlos Johnson, of aggravated robbery, and the trial court imposed a sentence of nine years with a release eligibility of eighty-five percent.  On appeal, Johnson argues:  (1) the admission of his redacted statement negatively impacted the jury's verdict; (2) he was denied the opportunity to present evidence in his own defense; (3) the State committed prosecutorial misconduct during its closing argument; and (4) the cumulative effect of these errors entitles him to relief.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Patrick M. Brooks (on appeal and at trial); Josie S. Holland (on appeal); and Ruchee Patel (at trial), Memphis, Tennessee, for the Defendant-Appellant, Dekarlos Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Amy P. Weirich, District Attorney General; and Austin B. Scofield, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

We have briefly summarized the facts from the joint trial of the Defendant-Appellant, Dekarlos Johnson, and his co-defendant, Bryant Gooseberry, because they are relevant to the issues on appeal.

**Trial.**  Hue Xa testified that on January 21, 2013, he made arrangements to buy an iPhone from a seller who had posted an advertisement on Craigslist.  That day, Xa called and emailed the seller, who had given him a price of $500 for the iPhone 5.  Xa made a

counteroffer of $400, which the seller accepted, and the two men arranged to meet at the Starbucks near the intersection of Whitten Road and Stage Road in Bartlett at 7:00 p.m. to complete the sale. Although Xa went to the Starbucks at the agreed upon time, the seller never arrived. After waiting for more than an hour, Xa telephoned the seller, who assured him that he was "on the way." Xa informed the seller he could wait no longer and returned home. Between 8:45 and 9:00 p.m. that night, the seller called Xa and asked to meet him at the Malco Theater on Bartlett Boulevard. Xa instead drove to the Applebee's restaurant on Bartlett Boulevard, where he felt safer, and asked the seller to meet him there, but the seller refused. Xa ultimately agreed to meet the seller at the Malco Theater and told the seller what kind of car he drove. When he arrived, Xa parked in the theater's parking lot. A moment later, two African-American men approached his car, and Xa lowered his window. One of the men gave Xa the iPhone 5, and Xa inspected the phone and used it to call his wife to ensure that it was operational. Xa agreed to pay $400 for the phone and began to take out his money. Xa explained what happened next:

> When I get the money out, and the guy stand[ing] just beside that guy had pulled a gun—pointed it right in my face. . . . [That man said,] "Give me money." And the guy talking to me, I g[ave] him the money. And he said, "Give me the phone." And . . . I just—the iPhone 5, I g[a]ve him the phone. And he was like, "Give me your phone." I pulled my—I got an iPhone 4. I g[ave] it to him. He said, pull out the car keys and give [the keys] to them.

Xa said the person with whom he had been communicating regarding the purchase of the iPhone was not the man holding the gun. He asserted that both men participated in the robbery, with one man pointing the gun at him and telling him to give him the money and the other man demanding the cell phones and car keys. Xa said that after he gave the men the $400, the iPhone 5, his iPhone 4, and his car keys, the men ran from his car and got into a black vehicle that was parked in a poorly lit area of the parking lot.

When Xa was asked at trial if either of the men who robbed him that night were in the courtroom, Xa replied negatively and explained that it had been more than two-and-a-half years since the robbery. Xa said the police interviewed him after the robbery, and he provided a statement to police in January 2013. In August 2013, he was shown a photographic lineup by the police, and Xa identified Johnson from the lineup as one of the men who robbed him. He also identified Johnson's co-defendant, Bryant Gooseberry, from a different photographic lineup as the second man who robbed him. At trial, Xa acknowledged that he might have been mistaken about his identification of the suspects in the photographic lineups.

A short time after the commission of this crime, Xa discussed the robbery with his friend, Michael Tran, who also had been looking for an iPhone to purchase on Craigslist. When Tran showed him an advertisement on Craigslist with the same phone number as the one belonging to the seller involved in the robbery, Xa asked Tran to talk to officers at the Bartlett Police Department.

Nathaniel Mebane, who was married to Johnson's aunt, testified that on January 21, 2013, he drove Johnson to the Malco Theater in Bartlett in his black Acura. Johnson told Mebane that he was going to the theater to see a girl. Mebane said he left Johnson in the middle of the parking lot but returned for him a short time later:

> I left, and in about fifteen minutes—I made it almost half way back to Frayser, and [Johnson] called me and told me to come back and get him, and by the time I got back, you know, he got up in the car, and we just left, and I asked him what happened, and he was like, "Well, she didn't show up." And he just left from there.

Although Johnson never mentioned paying him for the ride, Johnson gave Mebane sixty dollars when he picked him up from the Malco Theater. Mebane acknowledged that when he had given Johnson rides to work in the past, Johnson had given him approximately ten dollars. Mebane also said that on the night of January 21, 2013, Johnson never mentioned selling an iPhone, but he admitted, "I knew he sold them, but he didn't tell me that's what he was going out that day to do."

Several months after taking Johnson to the Malco Theater, the Bartlett police came to Mebane's home and spoke with his mother, the registered owner of the black Acura. Mebane told the police he had driven Johnson to the movie theater on January 21 and that Johnson had paid him "to do it." Mebane said he dropped off Johnson in the middle of the parking lot and picked him up at "the beginning of the driveway [to the side of the entrance] where you c[an] see the least little movement." He confirmed that no one was with Johnson or near him when he picked him up. The police showed Mebane some photographs, and he informed the officers that the photographs, which were entered into evidence at trial as Exhibits 3 and 4, depicted Johnson holding an iPhone inside Mebane's car.

Detective Jeffrey Swindol of the Bartlett Police Department testified that he investigated the aggravated robbery of Hue Xa at the Malco Theater. His investigation indicated that the perpetrators left the crime scene in a black Acura. On January 22, 2013, he was approached by Michael Tran, Xa's friend, who gave him the two photographs in Exhibits 3 and 4. After receiving these photographs, Detective Swindol contacted Detective Keys, who determined that the photographs provided by Tran had

-3-

been taken by a third party at an apartment complex on Raleigh Millington Road. Detective Swindol went to this complex and found a black Acura with "cuts and marks" on the interior of the vehicle that matched the ones depicted in the photographs provided by Tran. Because the black Acura was backed into a parking spot close to some shrubbery, he intermittently observed the car for several days before obtaining a license plate number for the vehicle. Detective Swindol entered the license tag in the computer database and learned that the Acura was registered to a woman at Dove Call Lane, although when he went to that address, it appeared as though no one lived there.

In August 2013, he ran the tag again, and a new address on Kenneth Street appeared. Detective Swindol went to this address, saw the black Acura, and spoke to Mebane's mother. He then spoke to Mebane, which led to the identification and location of the Defendant-Appellant, Dekarlos Johnson. Shortly thereafter, Detective Swindol prepared a photographic lineup that included a photograph of Johnson, and Xa identified Johnson as one of the men who robbed him within five seconds of looking at the lineup. Xa also circled Bryant Gooseberry's picture on a different photographic lineup. After Xa identified Johnson, Detective Swindol approached Johnson and informed him of his <u>Miranda</u> rights. Johnson signed a written waiver of these rights before providing the following written statement, which was read by Detective Swindol at trial:

> On the night of January 21ˢᵗ 2013, I was involved in a robbery. I walked up to the car of an Asian man. The intention was to sell an iPhone. After the transaction took place, (indiscernible) to remove the keys from the car. N[athaniel] Mebane III was the driver of the vehicle that was used. It was never my intention to rob anyone I swear.
>
> Two days later I reposted my phone on Craigslist, but I never got the chance to sell it because I couldn't find a ride.

During the interview with Detective Swindol, Johnson admitted he owned the gun that was used in the robbery. Johnson was subsequently arrested. Detective Swindol also issued a warrant for Gooseberry's arrest after Xa circled Gooseberry's picture in the photographic lineup. Gooseberry declined to give a statement to police.

Detective Swindol acknowledged that Xa was unable to tell him the make and model of the black car involved in the robbery. However, Xa told him that "he was instructed to be looking for a black Acura when he was initially going to make the purchase."

When the State rested, Gooseberry's attorney and Johnson's attorney made a motion for judgment of acquittal. After hearing argument from the parties, the trial court

denied the motion as to Johnson. However, regarding Gooseberry's motion, the trial court noted that although Xa had identified a picture of Gooseberry in the lineup, this identification was eight months after the robbery occurred. The court also recognized that Xa was unable to identify Gooseberry as one of the perpetrators at trial and that Xa admitted he could have been mistaken about his identification of the suspects in the photographic lineups. The State responded that it might be premature to rule on Gooseberry's motion because no one knew whether Johnson would testify, which could change the evidence presented at trial. The trial court, noting that it had to rule on the motion based on the evidence presented at that point, denied Gooseberry's motion but acknowledged that it was "a real close question, quite frankly." Immediately thereafter, Gooseberry and Johnson, upon voir dire examination, made the decision not to testify at trial. No proof was presented on behalf of either defendant. After both defendants rested their case, Gooseberry's attorney renewed his motion for judgment of acquittal. The court heard additional arguments from Gooseberry's attorney and the State, and Johnson's attorney also renewed his motion for judgment of acquittal. In responding to Johnson's renewed motion, the State asserted: "[Johnson], in fact, wrote that statement [to police] out in his own hand and seemed to be very quick in that statement to try and distance himself and accuse Mr. Gooseberry as the one who was with the gun and doing everything bad; although that was redacted." The trial court denied Johnson's motion but took Gooseberry's motion under advisement.

The next morning, the trial court granted Gooseberry's motion for judgment of acquittal, stating:

> In this case, the only proof against Gooseberry is the photospread where an identification was made eight months after the alleged crime. That, by itself, would be weak evidence, but I don't weigh the evidence. That's for the jury. And if that's all we had, I think I w[ould] deny the motion for judgment of acquittal. But when you add the victim's statement that he could be mistaken as to that identification, I think, as a matter of law, that's insufficient to let it go to the jury, so I have no choice but to grant the motion for judgment of acquittal as to Mr. Gooseberry.

At the conclusion of the trial, the jury found Johnson guilty of the charged offense of aggravated robbery.

## ANALYSIS

**I.  Unredacted Statement.** Johnson argues that the admission of the redacted version of his statement to police prejudiced him at trial. He asserts that if his unredacted statement, which he claims contained proof reducing his culpability, had been admitted,

-5-

then the jury would have convicted him of a lesser included offense. We conclude that Johnson is not entitled to relief.

Johnson asserts that his statement to police was redacted to protect Gooseberry's Sixth Amendment rights.[1] See Bruton v. United States, 391 U.S. 123, 135-37 (1968) (holding that admission of a codefendant's statement implicating a non-confessing defendant in a joint trial violates the defendant's right of confrontation). He claims that because the trial court granted Gooseberry's motion for judgment of acquittal at the close of all the proof, it should have admitted his original, unredacted statement to police into evidence. As support, he maintains that the jury would have been permitted to consider his unredacted statement if he and Gooseberry had been tried separately or if Gooseberry had been acquitted at the close of the State's proof.

Johnson claims that the redacted statement, which was admitted at trial, was particularly incriminating because it made it look as if he "had given a blatant, unmitigated confession" to the crime charged in the indictment. He asserts that the original, unredacted version of his statement, which is not included in the appellate record, was critical to his defense because it placed the gun in Gooseberry's hand, showed that Johnson never intended for a weapon to be used, and established that he did not know Gooseberry was going to use a gun.

In making this argument, Johnson acknowledges that he never made a contemporaneous motion to admit the unredacted version of his statement but nevertheless asserts that he is entitled to plenary review because he raised this issue in his motion for new trial. Alternatively, he argues that this court should consider this issue under plain error review.

We conclude that Johnson has waived this issue because he failed to make a motion to sever his trial from Gooseberry's and failed to make a contemporaneous motion requesting that his original, unredacted statement be admitted at trial. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The record shows that the redacted version of Johnson's statement was read to the jury and that a copy of this redacted version was admitted into evidence as Exhibit 6. However, Johnson's original, unredacted statement was never made a part of this record nor were the proceedings related to the redaction of his statement, which also results in waiver of this issue. See

---

[1] Although the record does not contain any proceedings related to the redaction of Johnson's statement, it appears that the statement was, in fact, redacted to remove all references to Gooseberry pursuant to Bruton.

-6-

Tenn. R. App. P. 24(b) ("[T]he appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal."); State v. Bledsoe, 226 S.W.3d 349, 357 (Tenn. 2007) ("It is the responsibility of the party raising an issue on appeal . . . to furnish the appellate court with a record that will enable that court to decide the issues raised."); State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) ("In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence.").

Because Johnson has waived this issue, he is not entitled to relief absent plain error. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). In order for this court to find plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Id. at 283.

We decline to review this issue for plain error. One of the factors required for plain error review is that the record clearly establish what occurred in the trial court. Id. at 282. Because the appellate record does not include the original, unredacted version of Johnson's statement to police, we are unable to determine the significance of having the unredacted statement admitted, which precludes plain error review of this issue. Moreover, Johnson has failed to show that a substantial right belonging to him was adversely affected. Id. Although Johnson claims that he was prejudiced when his unredacted statement was not admitted following Gooseberry's acquittal, it appears that his unredacted statement was inadmissible hearsay for which there is no exception. See State v. King, 694 S.W.2d 941, 945 (Tenn. 1985) (reiterating that if self-serving declarations were admissible, then an accused could create proof for himself by making exculpatory statements for later use at trial to show his innocence); See State v. Turnmire, 762 S.W.2d 893, 897 (Tenn. Crim. App. 1988) ("The reason self-serving declarations are excluded is that there is nothing to guarantee their testimonial trustworthiness."). Finally,

-7-

even if the unredacted statement had been included in the appellate record, Johnson would not have been entitled to relief pursuant to the "rule of completeness" in Tennessee Rule of Evidence 106 because this rule allows the jury to assess related information at the same time rather than piecemeal, an impossibility if Johnson's statement was, in fact, redacted pursuant to Bruton. See State v. Torres, 82 S.W.3d 236, 252 (Tenn. 2002) ("[T]he rule of completeness . . . reflects a concern for fairness and allows the trier of fact to assess related information at the same time rather than piecemeal."). For all these reasons, Johnson is not entitled to relief on this issue.

**II. Denial of Opportunity to Present Evidence.** Johnson also argues that his right to a fair trial was violated when the trial court failed to rule on Gooseberry's motion for judgment of acquittal at the close of the State's proof and before he and Gooseberry waived their right to testify. He claims that if the trial court had acquitted Gooseberry before the close of all proof, he would have been able to testify on his own behalf and could have presented the unredacted, exculpatory version of his statement to police. Johnson asserts that the admission of the redacted version of his statement, when combined with the timing of the trial court's acquittal of Gooseberry, prevented him from presenting his case or making an informed decision regarding whether to testify. He also maintains that at the moment of Gooseberry's acquittal, the truncated version of his redacted statement was misleading and no longer necessary under Bruton. We conclude that Johnson has waived this issue and is not entitled to plain error relief.

The record shows that Johnson's attorney never objected to the trial court's failure to rule on Gooseberry's motion at the close of the State's proof and never sought to reopen Johnson's defense following Gooseberry's acquittal. Consequently, Johnson has waived this issue. See Tenn. R. App. P. 36(a). We again question whether Johnson's unredacted statement, which was not included in the appellate record, would have been admissible even if he had reopened the proof. See King, 694 S.W.2d at 945; Turnmire, 762 S.W.2d at 897. Finally, we decline to find plain error because a clear and unequivocal rule of law was not breached, a substantial right of the accused was not adversely affected, and consideration of the error is not "necessary to do substantial justice." Smith, 24 S.W.3d at 282.

**III. Claims of Prosecutorial Misconduct.** Johnson contends that the prosecutor committed misconduct during closing argument by commenting on Johnson's right to remain silent and by unfairly characterizing the evidence. We disagree.

During the State's first closing argument, the prosecutor stated that Xa had identified Johnson as one of the perpetrators in a photographic lineup approximately seven months after the robbery and that Xa had no hesitation in identifying Johnson at the time. He noted that when Xa identified Johnson in the lineup, Detective Swindol had

already independently developed Johnson as a suspect. He also noted that Mebane, Johnson's uncle by marriage, testified that he dropped off Johnson at the Malco Theater the night of January 21, 2013, and that when Mebane picked up Johnson fifteen minutes later, Johnson "had sixty dollars in cash to hand over [to Mebane]." The prosecutor then made the following statements:

> So, now we've got Mr. Xa[, who] picks Mr. Johnson out of a photo lineup. [Mr. Xa states,] "He's the man who was there. He's the man who robbed me." Mr. Mebane, Mr. Johnson's relative, [says], "Mr. Johnson was there. He suddenly called me back to pick him up and had cash."
>
> Then, finally, Mr. Johnson says he was there in his statement in his handwriting that he made to Detective Swindol. [He says,] "I was involved in a robbery. I walked up to the car of an Asian man. The intention was to sell him an iPhone."
>
> So, now we've got Mr. Xa who said Mr. Johnson robbed him. Mr. Mebane says he dropped Mr. Johnson off, picked him up fifteen minutes later, and he had cash that he didn't have before. And Mr. Johnson says, "I was there. I was selling an iPhone to an Asian man. He was robbed.["] And we know, from Mr. Xa's testimony, that is not in dispute—it's never been said that none of this is correct. Mr. Xa testified the man selling him the iPhone—Mr. Johnson, the man who said he was there selling an Asian man an iPhone is the person who took his cash is the person who took his phone is the person who took his keys. Two men there, one man with a gun who said, "Give me the money," and the guy selling him the iPhone, Mr. Johnson, self-admitted, the man is there selling him the iPhone is the one who took his money, took his cash, took his phone, took his keys. They're there together. They walked up together.

Next, the prosecutor reminded the jury of the theory of criminal responsibility, stating:

> Remember the criminal responsibility example I gave you when I went and burglarized someone's house with all my buddies, if you're a part of it—if you're getting something out of it, you're responsible for the whole thing. And Mr. Johnson was more than just a little bit [responsible]. He set it up. He took the item. He provided the gun. Detective Swindol testified, "Who owned the gun that was used in the robbery?" Mr. Johnson. The only thing he wasn't doing was holding the gun.

At that point, Johnson's attorney made the following objection, "Objection, Your Honor. Mr. Xa never testified to a gun being pointed at him," and the State replied, "He most certainly did, Your Honor." The trial court immediately provided this curative instruction to the jury: "Okay, okay, okay. Members of the jury, you heard testimony in this case. You decide what was said. Okay. You may proceed." The prosecutor continued his closing argument:

> Mr. Johnson provided a gun used in the robbery that Mr. Xa testified was pointed at his face. He did everything except hold the gun. That doesn't matter because he's criminally responsible.
>
> Mr. Johnson [was] identified by Mr. Xa.
>
> Mr. Johnson [was] identified by Mr. Mebane.
>
> Mr. Johnson identified . . . himself.
>
> Read his statement when you go deliberate. Mr. Johnson is the one who robbed Mr. Xa. After you look at the evidence and deliberate, I'm confident you're going to find him guilty of aggravated robbery.
>
> Thank you.

First, Johnson argues that the prosecutor improperly commented on his right to remain silent. He asserts that the prosecutor's statement, "[I]t's never been said that none of this is correct," amounts to a comment on Johnson's failure to testify. While Johnson's admits that "[t]rial counsel did not . . . specifically raise the issue of the prosecution's improper comment on [his] right to remain silent," he nevertheless asserts that his attorney "objected to the prosecutor's closing argument contemporaneously and raised the issue in his motion for new trial."

The record shows that Johnson's attorney never made a contemporaneous objection to the prosecutor's statement that "it's never been said that none of this is correct." The trial transcript shows that Johnson's attorney made only one objection during the prosecutor's closing argument, which concerned whether Xa testified that a gun was pointed at him during the robbery. Because the record shows that Johnson never made a contemporaneous objection to the prosecutor's statement, "[I]t's never been said that none of this is correct," this issue is waived. See Tenn. R. App. P. 36(a). This issue is also waived because Johnson never raised this issue in his motion for new trial. See Tenn. R. App P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be

predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); see also Martin, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant loses the opportunity to argue on appeal any issues that should have been presented in a motion for new trial but were not raised in said motion); State v. Turner, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995) ("A party may not raise an issue for the first time in the appellate court.").

Because Johnson has waived this issue, he is not entitled to relief unless the prosecutor's comments rose to the level of plain error. See Tenn. R. App. P. 36(b); Smith, 24 S.W.3d at 282-83; see also State v. Gann, 251 S.W.3d 446, 458-59 (Tenn. Crim. App. 2007) (concluding that the defendant's failure make a contemporaneous objection during closing argument waived plenary review of the issue and precluded relief absent plain error).

We conclude that the prosecutor's statement does not constitute plain error. The statement was not a comment on Johnson's right to remain silent but rather an acknowledgment that the evidence presented at trial, including Johnson's own statement to police, established that Johnson was one of the perpetrators of Xa's aggravated robbery. Before making the challenged statement, the prosecutor noted that Xa identified Johnson from a photographic lineup as one of the men who robbed him, Mebane testified that he dropped Johnson off at the location of the robbery and when he picked him up fifteen minutes later, Johnson had cash that he did not have before, and that Johnson admitted in his statement to police that he was involved in a robbery of an Asian man to whom he intended to sell an iPhone. We decline to review this issue for plain error because a clear and unequivocal rule of law was not breached, a substantial right of the accused was not adversely affected, and consideration of the error is not "necessary to do substantial justice." See Smith, 24 S.W.3d at 282.

Second, Johnson contends that the prosecutor unfairly characterized the evidence during closing argument. However, because he presents no argument on this issue and provides no references to the relevant portions of the record, this issue is waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (stating that a brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on"). Although Johnson's attorney did object that "Mr. Xa never testified to a gun being

-11-

pointed at him," the record clearly reflects that Xa presented the following testimony at trial: "When I get the money out, and the guy stand[ing] just beside that guy had pulled a gun—pointed it right in my face." Because Johnson has waived any claim that the prosecution mischaracterized evidence, he is not entitled to relief. We also decline to find plain error because a clear and unequivocal rule of law was not breached, a substantial right of the accused was not adversely affected, and consideration of the error is not "necessary to do substantial justice." See Smith, 24 S.W.3d at 282.

**IV.** **Cumulative Errors.** Finally, Johnson contends that even if the aforementioned errors were individually harmless, the cumulative effect of these errors violates his right to a fair trial. See State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010) ("The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial."). Having found no error in the trial proceedings, we need not consider the cumulative effect of the alleged errors.

## CONCLUSION

Based on the aforementioned authorities and reasoning, the judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

-12-